May it please the Court. Good morning. There are two reasons that the Court should reverse a district court ruling in this case, and I'd like to preview briefly those two reasons and then circle back and talk in some detail about them. First, FloaTEC agreed in its contract with Chevron to accept responsibility for all damage to Chevron property that arose out of FloaTEC's work. FloaTEC agreed to insure its responsibility for the damage to Chevron's property, and FloaTEC agreed that Chevron's insurance would not be called on to respond to any of the contractual responsibilities that FloaTEC accepted in the contract. Now, the policy, which must be considered to determine the benefits that could be available and the access to the policy, requires that the contract that FloaTEC entered into with Chevron be considered. The case law supports the fact that the contract must be considered in determining the accessibility of the policy, and when one considers the allocation of responsibility in the contract and the fact that FloaTEC accepted this responsibility contractually as basis of the bargain for entering this deal, it's wholly inconsistent and unreasonable to say that there is a waiver of subrogation in this case that defeats underwriter's action. Second point on arbitration. Of course, we have Judge Kavanaugh, Justice Kavanaugh's opinion from yesterday on arbitration, which I assume the panel has seen. I think if there was ever any doubt, it's a little bit serendipitous perhaps, but we now have a very clear statement that where there is a broad delegation clause in an arbitration agreement, which we have here, it doesn't matter what the merits are that the case is to be sent to arbitration for determination. It unanimously overruled one of my opinions, so we'll pay close attention to it. And, of course, we're aware of it and we'll apply it. Right. Of course. It's interesting what the Court said in that case. You can't short-circuit the process, right? If there's a broad delegation clause, you don't talk about the merits. Well, FLOTEC wants to talk about the merits. They want to talk about their defense. Their defense is a waiver of subrogation. Waiver of subrogation connotes there is subrogation. All right? There is a right of subrogation here. There's no doubt. There's 550 million reasons why the underwriters have a right of subrogation here. They have an equitable right, a legal right, and a contractual right. The question that FLOTEC raises is a defense. It's an affirmative defense to that. That means it's merits. That means it doesn't get decided here. It gets decided in an arbitration. And, of course, if the Court agrees with that, the other issue doesn't need to be determined. It just gets sent back and it gets kicked into arbitration for the determination of the merits. Now, let me go back to Issue No. 1 and the assurance status and the waiver of subrogation. I've given the Court some excerpts from the contract. The contract's in the record, obviously, and these are the excerpts that I think are relevant to the issue before the The first paragraph of relevance is Paragraph 9, and it's entitled Claims, Liabilities, and Indemnities. Now, these are — this is a $5 billion project. Even for Chevron, it's a big deal. All right? And it's going to require contracts that Chevron, who's acting as its own project manager, is going to enter into with dozens of different contractors who are going to provide different kinds of services, and, therefore, they're going to have different rights, responsibilities, liabilities, indemnities in the various contracts. But in the FloTech contract, FloTech agrees — first of all, Paragraph 9.1 says — let's talk about the intent of what we're doing here. The parties agree to allocate between them the responsibility for all claims, as set forth here. Two sophisticated parties doing stuff they do all the time, negotiating a contract, and they're saying, here's how we are going to allocate our responsibilities. First thing they say is property. All right? Any property damage FloTech accepts responsibility for is going to indemnify Chevron. Anything. Next provision, 9.3, is amended. All right? There's a — if you look at the contract, the amendment is at the back of the contract, so clearly it was thought about, it was negotiated. But the amended 9.3 says that FloTech agrees to indemnify Chevron for damage to Chevron property. That's what happened here. Roberts. If Chevron were suing FloTech, that paragraph would certainly be activated. So my question is, your clients are not privy to this contract, right, with Chevron and FloTech. On what basis — on what basis do you argue that you can stand in Chevron's shoes with respect to these contractual provisions that you're talking about? Basic subrogation law. Once — once an insurer pays a claim under a policy, they have a right of subrogation, they stand in the shoes, it's supported in equity, it's supported in the policy, so it's — and it's supported in the law, so it's legal, equitable and contractual that the underwriters have a subrogation right and stand in Chevron's shoes to enforce the contract. Okay. So — so that — that gets us to your client's contract with Chevron, right, which defines — I'm sure you'll get to this at some point, but I just want to hear your answer to it. The definition of other assureds in the Chevron underwriter's contract is pretty broad. It is. Do you — do you concede that FloTech falls under that definition? If you're going to only read that definition in isolation — Well, reading the definition in isolation, do you agree that FloTech falls within that definition? They have a written contract with Chevron regarding the project. But I do not agree — the law requires the entirety of the policy to be considered, right? I mean, I think that's basic Hornbook law. There's lots of cases saying that, right? So you've got to not just consider that definition. Obviously, you have to consider it. But you have to also consider the next provision, which is a special condition for other assureds, because that condition expresses a limitation on what benefits an assured or another assured can have under the policy. And so the whole policy has to be read together. If I might just — if I'd like to just, if I can, I'll circle back to you and finish that, but I wanted to just touch on the last bits about the contract, because I think that it's important to understand the totality of this risk allocation and insurance allocation that was the basis on which FloTech entered this project, because it's part of how you have to — what you have to understand to construe the policy. So the last provision I wanted to touch on, 9.3, the acceptance that Chevron property damage is going to be the responsibility of FloTech. That's what happened here, this Chevron property. And then the last point here is claims. The definition of claim is extremely broad. It encompasses everything you could think of as a claim. And those are the things that FloTech agrees to take on as responsibility. And if you turn the page to paragraph 10, that's the insurance allocation. And the insurance is consistent with the indemnity allocation, the risk allocation in paragraph 9, right? And it says FloTech is going to insure this risk. And the insurance that FloTech has to get to insure its responsibility to third parties is, of course, liability insurance. And so they're not going to — FloTech is not going to buy builder's risk coverage. They're going to buy liability coverage. And they say, we're going to get the liability coverage that's going to insure our responsibility that we might have to Chevron under this contract. It's going to name Chevron as additional insurance. It's going to waive rights of subrogation against Chevron. And, importantly, it says none of Chevron's insurance will be called upon to respond to any of the responsibilities that FloTech agrees to accept in this contract. Okay. That's a pretty compelling — it's one-way street, right? Chevron's a big oil company, and FloTech is coming in, and they have to indemnify to do this work, Chevron, and they have to indemnify Chevron for the property. They have to agree their insurance is going to respond. They have to agree their insurance — that Chevron's insurance does not respond. Now, let's turn to the last page of the handout, because the special condition for other assurance speaks to the limitation and has to be considered in conjunction with Judge Dunkel, which you point out in the other assurance definition. All right? So you've got three sentences. So I understand the special conditions for other assurance appears in the Chevron contract with your clients. No. It's in the policy. Okay. It is the provision that follows immediately after the other assured definition that you just quoted. Okay. So the next provision says — three sentences, three things it says. If you're an other insured, you're going to be covered throughout the entirety of the policy unless specific contracts say to the contrary. All right? Note the wording here. It's important. Covered throughout the duration unless specific contracts say to the policy. Excuse me. Say to the contrary. Uses the word covered. Second sentence. The rights of any assured have to be exercised through the principle assured Chevron. Does — again, the language here. The rights. Not claims have to be presented. Not proofs of loss have to be presented. The rights under this policy have to be exercised through the principle assured Chevron. And then third is where the benefits of this contract — excuse me, this policy — have been passed by contract. The benefits shall be no greater than that contract allows. Again, the words benefits. It doesn't say coverage. It doesn't say where you have coverage. The coverage is no greater. It says benefits. It's an important distinction because benefits is broader than coverage. It includes coverage. But benefits also includes what they're trying to argue. They're trying to argue for in this case, which is the benefit, as they refer to it in their briefing, and as the district court referred to it below, the benefit of additional assured status and waiver of subrogation. All right? The benefit shall be no greater than the contract allows. This contract that FloTech agreed to does not allow them the benefit of other assured status or a waiver of subrogation on Chevron's contract. It specifically disavows that. It says we can't make a claim. You, FloTech, can't make a claim on that policy. It's non-contributory. It says we're going to insure it. It says we're going to be responsible for it. The case that I think really is illustrative on this is the Deepwater Horizon case decided by the Texas Supreme Court. There are some differences because that case was about coverage. But the rationale that the court applied is spot on for this case because what the court said is BP was arguing, look, we're insured under the trans-ocean policy. There was no dispute about that. They were insured. Now, it wasn't an issue of waiver of subrogation for assured status. They were saying we're insured so we've got coverage. And all you do is look at the policy to decide if we've got coverage, and there's clearly coverage for this pollution emanating from below the mud line. All right? That was the BP position. The court said, no, we've got to look at the contract as well. And in your contract with trans-ocean, you, BP, accepted responsibility for pollution emanating below the mud line. It makes no sense for us to then say, but you're going to get rights against trans-ocean's policy for the contractual responsibility you agreed to accept. You've got your own ability to take care of that. You've agreed to take care of that. We're not going to give you access to it. Now, the district court got caught up in the fact that the contract doesn't specifically mention builder's risk coverage, doesn't say anything about it. That's what the case was in the BP situation and in Deepwater Horizon. The contract and the policy didn't specifically say, or the policy didn't specifically say you don't have rights or your rights are limited, as another assured, only to what's available under the contract. It was silent. And what the court said is, but if we look at the allocation of responsibility, if we look at how they allocate the risk, it just doesn't make sense and therefore is not a reasonable construction to say that BP could accept responsibility but at the same time get coverage under trans-ocean's policy for what it'd accept the responsibility of. I think that's spot on here in terms of the rationale that the court goes through. These are heavily negotiated contracts. There is a risk allocation. The risk allocation that Flowtech agreed to is wholly inconsistent with the position that's taken in this court and particularly on a Rule 12b basis. It's just an inappropriate decision by the court below. Lastly, in arbitration, I just have a bit of time left. As I said, there's the payment of $550 million gives underwriters the right of subrogation. That's basic law. Flowtech has raised a defense to that, saying, no, you have waived it. Because we are an additional assured, another assured, and you have a waiver of subrogation provision in the policy. You have waived it. I'm looking at the contract just to make sure we're tracking here. It says, Underwriters agree to waive rights of subrogation against any principal assureds and or other assureds. Correct. All right. So from the arbitration perspective, the point is that's an affirmative defense. The court, the district court recognized it as an affirmative defense. It's an issue on the merits. Okay? We're talking about are there another assured? If so, what does that mean? Is it conveyed benefits greater than the contracts allow? Special condition for other assured? However, it's merits. And that's their defense to the case. That's appropriate not for the court. It's appropriate to be referred to the arbitration panel. Thank you. All right. Thank you, Mr. McCaul. You've saved time for rebuttal. Thank you. The clerk. May it please the court. Andrew, the clerk for Flow Tech. I'm going to address the issues that Mr Hall addressed, but a little bit in a different order, if that's all right. I'd like to talk about four main points. The first is the order of decisions. The next is the waiver issues. And there are waiver issues. The next would be Flow Tech's other assured status and the anti-segregation rule. And we submit that the inquiry really should end there because we're not seeking coverage under this policy. Clearly, appellants think that the inquiry should go further. So I will talk about the special conditions for other assureds and the allocation of risk theory that's been articulated. But I would prefer to refer to actual pages from the record rather than the snippets that were. Always helpful. Yes, indeed. The first thing that I should mention is, of course, Judge Kavanaugh's decision seems to be his first one that was issued yesterday. And I think it supports our position because it's premised on the existence of an agreement between the parties to arbitrate the case. In other words, you have to be a party to the agreement if you want to argue about arbitrability. This is the cart before the horse argument. So where Judge Kavanaugh says the relevant contract between the parties provided, the assumption, of course, is that you're talking about the parties to the agreement, not the parties to the case. And here, just to, I mean, I guess to complete that thought, just here are the parties Chevron and FloTech agreed to arbitrate. Correct. But we maintain that the underwriters are not a party. They do not stand in the shoes. They have no shoes. That's what it's about. So if FloTech were here arguing with Chevron about some threshold arbitration, arbitrability issue, and the opinion and maybe this panel thought, well, that's wholly groundless, now we've been instructed by the Supreme Court that that's wrong and we'd have to refer it to the arbitrator. Yes. If Chevron was making a claim, we would have to arbitrate that. But they're not. They might later, but not. So as far as the order of decisions is concerned, the district court was correct in our view to look at whether there's a right of subrogation because if there isn't, they're not a party to the contract at all. So you do have to look at whether they stand in the shoes first in order to decide whether they're a party. And of all the decisions that have been issued, note that Judge Smith has been on a number of them, so I'm basically talking to the Delphic Oracle about this. Underwriters want to stand in the shoes. That's what exactly is in dispute. So the gateway issue is whether they're a party to the agreement to arbitrate. The only way to determine that is whether they have a right of subrogation or not. So the jurisprudence, in our view, is premised on this idea, exactly as Judge Kavanaugh said. You've got to be a party to this. The jurisprudence talks about the two-step process. Obviously, the first step is whether there's an agreement. And as far as we're concerned, the delegation clause, the second step, doesn't come into play until you've decided whether they are a party to the agreement or not. And Judge Smith was on the Kibale case, on the Douglas case, on the Britannia U case. And as best I can tell, he understood that there was a conflation problem here between the arbitrability issue and status. That's the point. The Fifth Circuit case, which is authoritative in our view as ASW, and in that case, basically the case was remanded back to the district court to decide that, whether they were a party or not. In the words of Judge Smith, the court always performs the first step. I think his words were, as it always does. So Judge Rosenthal was correct in firstly deciding whether they're a party. And to do that, you have to figure out whether they're segregated or not. And just to be clear, in your view, the new Supreme Court opinion precedent doesn't touch that point. Correct. Now, I need to address the waiver issue. It seems to me that by filing suit, the underwriters waived the right to claim, to make a claim that they are a party to the arbitration clause. They completely ignored the dispute resolution clause, filed suit in the district court, and in fact argued against arbitration in the district court. Flotex being entirely consistent and said, you have no right, ergo motion to dismiss, but if and only if you have a right, well then it's arbitrable. So it seems to me that underwriters can't explain away the fact that they filed suit first. I know there's a Judge Smith case that says you can file suit first if you're looking for an injunction. But otherwise, you're invoking the legal process. And thereby, I think judicial machinery is the term. And that means that you've waived your right to claim arbitration. Judge Smith was in the Myrant case. In that case, Castex filed three motions to dismiss in the knowledge that they had an arbitration clause. And the requirement that there be prejudice, I think, is evidenced by the fact that I'm standing here today. I mean, what would have happened if we had filed a motion to compel? They would have argued that thereby we had waived the right to say that they're not segregated. We would have been in a waiver situation then, which we're not. So we maintain that they've waived their rights. As far as the other assured status is concerned, the policy clearly precludes a right of subrogation against other assureds. We had the little handout where we have the actual pages. The record excerpt page then is 977 or 1020. They're both in there. So the policy then says you're an other assured if you've entered into a written contract. There's no qualifying language. All right. The subrogation clause, which is then on the next page, is equally straightforward. Underwriters have subrogation rights other than against principal assureds and other assureds. Again, no qualifying language. And frankly, you don't need to reach the waiver clause. There's no right of subrogation. That's what it says. Also, the anti-subrogation rule comes into play, which has been roundly ignored by my opponent. Underwriters have necessarily admitted, I think this went to the question that you asked, if you say the special conditions apply, you've admitted that we're an other assured. So that is beyond doubt. The argument appears to be that the special conditions clause somehow modifies the other assured definition. So could you address that? Sure. The point there is that we're not seeking coverage. We're seeking not to be sued. And the first sentence we maintain relates to the period of insurance. There is coverage, if you're looking for it, for this period unless there's something to the contrary. Furthermore, there isn't anything to the contrary. The contract doesn't mention builder's risk insurance. It doesn't say that we have to obtain builder's risk insurance. It mentions watercraft, aircraft, CGL, P&I, stuff like that, workers' comp. CGL, of course, has a professional services exclusion. So our point is, the main point is, is that there's nothing to the contrary. If you're going to say that this doesn't apply to the period, which is what the words say, then there's nothing to the contrary. And I'll address that a little bit more in the next section. It seems to me that the jurisprudence, places like Texaco and Amclyde and AGIP Petroleum, show that the court looks to the plain language to determine other assured status. And it doesn't depend on coverage. There's a passage in Judge Rubin's opinion in the Marathon case where he says that even if the theory is that the recoupment is based on the other assured exposure for risks not covered by the policy, the waiver of subrogation, or the lack of the right of subrogation, is still intact, simply because the policy says that. The underwriter's reliance on some of these cases where there's a little sting in the tail in the definition, a written contract that provides that so-and-so has to provide insurance, that sort of thing, all of those cases have that little sting in the tail. Our language does not. Simply doesn't. So there's no limit to the status of an other assured where a written contract exists. I submit that they're trying to rewrite this policy. And if you think in terms of the single coverage approach, if you required every one of these subcontractors to buy builder's risk, the premium here was $50 million, you would mean that every subcontractor, including my people, would have to pay $50 million for insurance and would therefore charge $100 million for what they did. It just doesn't make sense. Okay? There's no requirement. It seems the other side places, at least as I understand it, heavy reliance on a Texas Supreme Court opinion, Deepwater Horizon. Yes. That may be one of these cases you were referring to, but if you could address that one specifically. Well, I guess what I'm looking at here is the policies extend insured status to any personal entity to whom the insured is obliged to provide insurance such as afforded by the policy. Well, that's precisely not what we're obliged to provide. We are not obliged to provide builder's risk insurance. We're not. That's the answer. So our argument about special conditions is we shouldn't reach it in the first place. If we do, we say it doesn't have any effect on the prohibition of the right of subrogation by virtue of its own provisions, by virtue of the Chevron contract, and also by virtue of this allocation of risk theory. As I've said, under the wording of the policy, we're an other assured. The special conditions clause doesn't create a right of subrogation. It deals with coverage. We're not seeking coverage here. Again, a conflating coverage with status. The first sentence deals, as I said, with the policy period. There's no limit in the contract on the coverage over the policy period. And the second sentence is conditional. It's where benefits are conferred. And in this instance, maybe they did, maybe they didn't. It doesn't really matter if there are no benefits conferred. I want to look at the insurance clauses. If you look at the handout that I have, the requirements for naming and waiving Sorry, this is the contract. If you look at the contract, clause 10, section 10, it talks about all of these workers' compensation, commercial, general liability. If you go to the next page, which is 636, the language that they're relying on, for instance, no other insurance carried by indemnities will be considered as contributory to the laws, is in a clause which applies only to sections 10-2B, C, D, and E, which is various types of insurance, none of which are billed as risk. The billed as risk policy itself, if you look at the policy excerpt on the last page, clause 20, says that the billed as risk policy is primary, and the policy shall be primary to and receive no contribution from any other insurance maintained by or for the principal assured and the other assured. The other point I want to make about this allocation of risk theory is that the indemnity clause runs both ways. If you read it, you can see it runs both ways. There's up to $5 million, there's everything above $5 million. What would happen if underwriters were allowed to subrogate and sue us? We were third-party Chevrolet. If they had to pay $500 million back to the underwriters, and they paid a $50 million premium for that privilege, I submit that it's not the intention of the parties to allocate the risk so that Flowtech has all the risk, and that this somehow vitiates the idea of the right of subrogation being absent. It doesn't create a right of subrogation. That makes no sense. This indemnity clause gives Chevron the lion's share of the liability for property damage. So it seems to me that this risk allocation theory, which then gets superimposed on the insurance privileges, is invalid as an argument. It just doesn't make sense when most of the liability is placed on Chevron. You heard, this is an enormous claim. Thank you. Thank you, Mr. Clark. Mr. Hall, you save time for rebuttal. What's your response to Mr. DeClerk's comments about the $50 million insurance? Oh, I'm not sure where he comes up with that number. There's not this policy cost. But let me talk about that, because that's a very interesting point. First, understand what this builder's risk coverage is. It is first-party property insurance. There's no liability coverage here. It's not going to cover any third-party claims at all. So who needs first-party property insurance at a risk of this magnitude, a project this magnitude?  You've got construction going on in the Gulf and various shipyards on the Tendons, on the top sides. All of those people involved in the actual construction who have property that they're working on, who therefore have some potential risk that something happens to that property, they need insurance. They're all covered. And all of those people that are covered have got contracts saying we're going to be covered by the builder's risk cover, right? Because we have a first-party risk. We don't want to have to fight among ourselves about transfer of title and messy things like that. We're just going to say wherever the property is, the people that are working on the property are covered, right? Now, there are other kinds of contractors that are different than that. Flowtech is one. Flowtech didn't build anything. Flowtech wasn't working on anything. It didn't have a first-party risk to insure. Flowtech provided soft engineering. They designed some systems that were supposed to keep the Tendons up. They looked at dynamics. They looked at stresses. They designed a system and an attachment, among other things, of the buoyancy cans that kept the Tendons upright. That's what we allege they did wrong. They failed to take into account some stresses that were exerted on the system, and therefore it failed. But they never had a first-party risk. They never were building anything. They didn't have the potential to have damage to property that was insured as project property. And the builder's risk policy provides no liability insurance. So they come into this deal saying we'll pick up any responsibility for your damage to your property and we'll insure it, and your insurance will not have to respond to this, okay? It's a totally different situation than the people actually building, and it's why that policy has that flexibility. It's why there is a broad other-assured definition. It's why there is a special condition for other-assureds, which allows modification through contract. The courts have recognized that. It's not just Deepwater Horizon, but there are other courts that have recognized in this kind of commercial setting, you have to look at the totality of the circumstances. It's made more difficult because they file a motion, a 12b motion, 12b-6 motion, we don't have any discovery yet to sort of illuminate a lot of these points. But that's the reason that this is set up that way. And they didn't need that insurance. If they had builder's risk insurance, it doesn't matter, because the builder's risk insurance, if they had it, isn't going to respond to this claim. Their liability policy, which they have, will. And their liability policy is what they agreed to take out to insure the damage that they could have caused, and we say they did cause, to Chevron's property. And if you take all that, look, it's they're trying to sneak out the back door. They agreed contractually to all of take up all this responsibility, and they're trying to sneak out the back door with a policy provision that they're not privy to and that they didn't have any ideas about and they've got no right to make a claim under, and they're trying to get out the back door. One other point I want to make, well, maybe two if I can sneak them in. But Mr. Clark says, look, if Chevron was here, we clearly have to arbitrate with Chevron. But Chevron's not here. Underwriters are here. Like I said, there is no doubt that underwriters are subrogated. Once you make the payment, we are subrogated. What's urged is not that we're not subrogated, not that we don't have the right to subrogate, but a waiver. Okay? And you've got to take them in sequence. You don't start talking about waiver unless there's a right to subrogate. And once we make the payment, the law is replete with examples. We've got the right to subrogate once we make the payment. They're talking about waiver. And that's a defense that's based on the merits. And then the last point I will make in leaving, there are lots of cases out there that say an other assured, they cite a bunch of them, other assured and waiver of subrogation go hand in hand, and an insurer can't sue somebody once there's been another assured status established and there's a waiver of subrogation. There is no case, no case, that deals with our special conditions for other assureds, which puts a limitation on what the policy will provide, benefits, not coverage. And there's no case that has their contract. Your time has expired now, Mr. Hall. Thank you. I appreciate it. Your case and all of today's cases are under submission, and the Court is in recess until 9 o'clock tomorrow.